IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 17, 2002

## STATE OF TENNESSEE v. WILLIAM JERRY NEAL,
## aka WILLIAM JAY NEAL

**Direct Appeal from the Circuit Court for Bedford County**
**No. 14846    Charles Lee, Judge**

————————————

**No. M2001-02364-CCA-R3-CD - Filed November 13, 2002**

————————————

The defendant, William Jerry Neal, also known as William Jay Neal, appeals his jury convictions for especially aggravated burglary, a Class B felony, and vandalism under $500, a Class A misdemeanor, resulting in concurrent sentences of eleven years, three months and eleven months, twenty-nine days, respectively.  On appeal, the defendant argues:  (1) the evidence was insufficient to establish serious bodily injury, as required for a conviction for especially aggravated burglary; and (2) the trial court erred by failing to grant a new trial after learning that one of the jurors had once been incarcerated with the defendant.  We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which THOMAS T. WOODALL and JAMES CURWOOD WITT, JR., JJ., joined.

Stephen W. Pate, Murfreesboro, Tennessee (on appeal), and Robert Marlow, Shelbyville, Tennessee (at trial), for the appellant, William Jerry Neal.

Paul G. Summers, Attorney General and Reporter; Kathy D. Aslinger, Assistant Attorney General; William Michael McCown, District Attorney General; and Michael D. Randles, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

The victim, Troy Enfinger, and the defendant had known each other most of their lives.  On November 8, 2000, while at the Jiffy Oil Station on Depot Street in Bedford County, the victim called the defendant and asked to borrow $20.  The defendant and his uncle, Jackie Freeman, came to the station where the defendant loaned the victim the money.  The victim agreed to go get some money and return to the station "in just a few minutes" to repay the defendant.  However, the victim

did not return to the station because he did not have the money. Later that evening, the defendant came to the victim's house. The victim did not answer the defendant's knock and, believing that the defendant had left, went to bed. About ten minutes later, the victim got up to check on some clothes in the dryer and when he returned to his bedroom, the defendant was standing there with an aluminum baseball bat. Screaming that he wanted his $20, the defendant hit the victim across his back with the bat, causing him to fall facedown on the bed and "nearly knocking the breath out" of him. When the victim looked up, he saw the defendant swinging the bat toward his head, so he raised his left arm to block the bat. The defendant hit the victim again, this time breaking his left forearm. The victim said the "bone was sticking out of" his bleeding arm, and the severity of the blow caused him to defecate in his pants. As the victim begged the defendant not to hit him again, the defendant swung the ball bat and broke the headboard of the victim's bed and a stereo. The defendant also knocked a hole in the wall. The defendant told the victim, "You ought to know better than to do me the way you done me. . . . You know I have killed somebody before. What makes you think I won't kill you[?]"

After the defendant calmed down somewhat, he allowed the victim to go to the bathroom. The defendant then called someone on his cellular telephone, instructing that person to send his uncles, Bill Freeman and Jackie Freeman, to the victim's house because he had "whipped [the victim's] ass because [the victim] didn't pay him the $20 back immediately." Shortly thereafter, Bill Freeman and Jackie Freeman arrived at the victim's house, and Bill Freeman asked the defendant, "What have you done?" Bill Freeman told the defendant to leave and offered to take the victim to the hospital emergency room, but the victim refused his offer and called his sister instead. The Freemans then left, and the victim called the Shelbyville Police Department. Two officers responded to his call and, soon thereafter, his father and brother arrived to take him to the emergency room for treatment of his injuries. At the emergency room, his arm was put in a splint, he was given an injection of morphine for pain, and he was instructed to see an orthopedic doctor. He subsequently saw an orthopedic doctor in Tullahoma who said he needed surgery because the bones in his arm had been crushed. However, he did not have any insurance and was unable to have the surgery. He next saw his family doctor in Shelbyville who referred him to Dr. Robert Crous. Dr. Crous put a cast on his arm which he had to wear for eight weeks. During that eight weeks, he was unable to work because his job as a shingle layer required the use of both arms.

On cross-examination, the victim admitted that he had drunk a six-pack of beer the night of the incident but denied having an axe handle or any type of wooden weapon in his house. He estimated that thirty minutes had elapsed between the time he borrowed the $20 from the defendant and the time the defendant assaulted him. He described the injury to his arm: "I could feel the bone and see the red meat. I couldn't see the bone with the naked eye. I knew the bone had come out of the skin. I have got a scar where the bone came out right here." The victim said that his arm was still bothering him.

Officer Cody King of the Shelbyville Police Department testified that he responded to the call at the victim's residence on November 8, 2000. The defendant was not at the residence when he arrived. King walked around the outside of the victim's house and noticed a truck with the

driver's side door open and the victim's bedroom window opened "just a little bit." Underneath the window was a plastic table which had a smeared footprint on top of it. The toe of the footprint was pointed toward the house. Inside the victim's house, he observed blood in the bedroom, kitchen, and bathroom. The victim, who was "very excited" and had a bloody towel wrapped around his arm, appeared to be in significant pain. King did not smell alcohol on the victim or see an axe handle or mallet in the victim's house. He observed the damage to the headboard of the victim's bed and the stereo but did not remember if the walls were damaged.

Officer Billy Smith of the Shelbyville Police Department testified that he responded to the call at the victim's residence with Officer King. Outside the residence, he observed a pickup truck with the driver's side door open and an open window in the victim's bedroom. Either an old table top or riding lawnmower was underneath the window, and on top of that object was "what was left of a foot print." The footprint appeared to be leading into the house, with the toes of the footprint pointed toward the house. Smith saw blood on the back concrete step of the house but did not see any blood in the victim's truck. Inside the victim's bedroom, the headboard of the bed and a stereo were "busted up," and there was a hole in the wall. Smith observed blood in the bedroom, hallway, and bathroom. The victim had a bloodstained towel wrapped around his arm and was in severe pain. The victim told him that the defendant had broken his arm and that the defendant might be at his uncles' apartment at Bedford Manor Apartments. The victim said that the defendant's uncles had been there before the police arrived. The victim also gave Smith a description of the defendant's vehicle.

Smith subsequently went to the Bedford Manor Apartments and spotted a vehicle matching the description the victim had given him. While waiting outside the apartments in his patrol car, Smith saw someone get into the vehicle, back out onto the street, and head in his direction. When the driver saw Smith, the driver backed the vehicle onto the sidewalk, jumped out, and ran. Smith turned on his spotlight and saw the defendant run into an apartment building but could not see which apartment he entered. Smith got out of his patrol car and was waiting for other officers to arrive when the defendant came out and told him, "You have got me. What do you want? What is going on?" Smith told the defendant that he had been accused of assaulting the victim. The defendant replied, "I wasn't there but he probably owes somebody some money. I wasn't there." Smith arrested the defendant, and Officer King transported the defendant to jail.

Dr. Robert Crous, an orthopedic surgeon, testified that he treated the victim for a fracture of the ulna shaft which was commonly known as a "night stick fracture." He first saw the victim five days after the injury on November 13, 2000. He placed the victim's arm, which was "quite swollen," in a splint but could not determine if the fracture was compound because five days had passed. The victim had a small cut close to the fracture which was healing. Dr. Crous last saw the victim on January 18, 2001, at which time his arm had completely healed and he released the victim to return to work. Dr. Crous testified that it took a "moderate to severe amount" of force to cause the fracture to the victim's forearm and rated his injury as "[m]oderately severe." On cross-examination, Dr. Crous testified that the general treatment for a compound fracture is to "cut it open, rinse the ends

of the bone out, leave the wound open and close it a few days later." He said that the victim did not receive such treatment.

The defendant testified that he loaned the victim $20 at the Jiffy Oil Station on the evening of the incident and that his uncle, Jackie Freeman, was with him at the time. The victim told the defendant he would repay him but did not say when. Later that evening, the victim called the defendant and asked him to come to his house because he had the money. The defendant testified as to the events that transpired at the victim's house:

> I went to [the victim's] house. . . . When I pulled[] in I had the door open. . . . I looked up and [the victim] was standing on like his – the sidewalk running towards my [vehicle] with an axe. I jumped in, all of the way back in and closed the door and jumped over to the passenger side. He was pulling at the driver's door. I jumped out the passenger side. When I did, he kind of tried to run around the front of the car. So I was running around the back. I was trying to keep him at all time[s] on the opposite side of the vehicle that I was on.

> We kind of ran back and forth a couple of times. I got chased around to the passenger side. When I did, he acted like he was going to go around the back. So I was going to run back around to the front. Instead he came around the front. I reached in the car. I just grabbed whatever I could get my hands on. At that time I swung and I am not sure where I hit him but I did hit him with the bat. He had fell [sic].

> The axe was laying [sic] beside me. He went to grab the axe. When he did, I swung again and hit him in the arm. He fell back again. He went to get up. When he did, it was like I thought he was going to grab for the axe again. So I reared back with the bat again. He said, "I am not going for the axe. I just want to get up. I just want to go in the house. I used the bathroom on myself." I said, "Don't grab for the axe." At that time he got up and went toward the house. I jumped in my car. That is when I had left.

The defendant denied knocking on the victim's door or entering the victim's residence. When asked if his uncles had been at the victim's house, the defendant said, "I didn't see. Like I said, I was hanging out and I got in and jumped out. Somebody chased me with an axe. I am not looking around to see if anybody is there."

The defendant also denied backing his vehicle up at a high rate of speed when he saw Officer Smith later that evening at the Bedford Manor Apartments. Officer Smith informed him that there was a warrant for him. The defendant denied telling Smith that he was not at the victim's house or

that the victim owed someone money. The defendant admitted that he never reported to the police that he had been victimized that evening, explaining, "I have known [the victim] since I was a kid. I know sometimes he smokes crack and he gets violent. I didn't know if it was that or the next day I go over there and he would be calm. I don't know. He gets on crack one minute he's one person and the next person [sic] he is just a whole different person."

Bill Junior Freeman, the defendant's uncle, testified that he and his brother, Jackie Freeman, went to the victim's residence in the late afternoon of November 8, 2000. Freeman pulled his vehicle partially into the driveway and saw the victim, with what appeared to be a stick in his hand, running toward the defendant's truck. Neither he nor his brother got out of his vehicle. Upon hearing sirens and because his brother was on probation and had been drinking, he drove his brother down the road and dropped him off. Freeman then returned to the victim's house but never got out of his vehicle, went inside the victim's house, or talked to the victim. Freeman noticed that the defendant's vehicle was no longer there. He then went back and picked up his brother and went to his apartment. About two hours later, the defendant came to his apartment. The police came to his apartment later that evening to arrest the defendant. Freeman admitted that he had been convicted on October 29, 1990, of aiding and abetting delivery of a controlled substance, cocaine.

## ANALYSIS

### I. Evidence as to Serious Bodily Injury

The defendant contends that the State failed to prove that the victim sustained serious bodily injury, and therefore the evidence presented at trial was insufficient for a conviction for especially aggravated burglary.

When the sufficiency of the evidence is challenged on appeal, our standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979). It is not our prerogative to reweigh the evidence. Rather, we presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

Tennessee Code Annotated section 39-11-106(a)(34) defines "serious bodily injury" as bodily injury which involves:

> (A) A substantial risk of death;
> (B) Protracted unconsciousness;
> (C) Extreme physical pain;
> (D) Protracted or obvious disfigurement; or

(E)	Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty[.]

The defendant relies on State v. Sims, 909 S.W.2d 46, 48 (Tenn. Crim. App. 1995), and State v. Zonge, 973 S.W.2d 250 (Tenn. Crim. App. 1997), to support his argument. In Sims, the victim suffered a broken nose and a bruised cheekbone as a result of being hit in the face with a gun by the defendant during a robbery. She was treated by emergency room physicians but was not prescribed pain medication. Sims, 909 S.W.2d at 49. To ascertain whether the victim suffered "extreme physical pain" as enumerated in the statute, the court determined that the "pain commonly associated with a broken nose" is not the same class of injury as those causing a substantial risk of death, protracted unconsciousness, protracted or obvious disfigurement, or protracted loss or substantial impairment of a bodily member, organ, or mental faculty. Id. Therefore, the court concluded that there was insufficient evidence to support a finding of "serious bodily injury."

In Zonge, the victim sustained bruises to her shoulder and back and a knot on her head, receiving four stitches. 973 S.W.2d at 255. Although the victim testified that receiving the four stitches was very painful, the court concluded that pain associated with her injuries was not of the same degree as that associated with the other classifications of "serious bodily injury." Id. We respectfully disagree that the injuries to the victims in Sims and Zonge can be compared to the victim in this matter.

There are a number of cases in which the victims sustained injuries comparable to the victim in this matter; and this court, in these cases, determined the victims sustained "serious bodily injury." In State v. Darren Matthew Lee, No. M1999-01625-CCA-R3-CD, 2000 Tenn. Crim. App. LEXIS 495 (Tenn. Crim. App. June 23, 2000), the victim sustained two black eyes, severe facial swelling, and a torn lip after being kicked repeatedly in the face for a period of time. Id. at *10. One witness said that the victim looked like "someone [that had] their [sic] head beat in." Id. at *11. The victim testified that he suffered from "extreme physical pain" as a result of the injuries and was unable to adequately perform his duties at work because of headaches. His treating physician testified that he suffered from an abnormal level of pain than that typically associated with his injuries. Id. at *12. Distinguishing the holding in Sims, this court concluded that because the victim in Lee experienced a "greater amount of pain than that 'commonly associated' with his injury," there was sufficient evidence in the record that the victim suffered from "extreme physical pain." Id.; see State v. Jason C. Carter, No. M1998-00798-CCA-R3-CD, 2000 Tenn. Crim. App. LEXIS 340, at **20-21 (Tenn. Crim. App. Apr. 27, 2000) (finding sufficient evidence for "serious bodily injury" where pain medication was prescribed for "rather significant" blows to the head and "rather extensive" abrasions to the shoulder, elbow, and knee), perm. to appeal denied (Tenn. Nov. 20, 2000); State v. Derrick M. Vernon, No. W1998-00612-CCA-R3-CD, 2000 Tenn. Crim. App. LEXIS 349, at *15 (Tenn. Crim. App. Apr. 25, 2000) (finding sufficient evidence for "serious bodily injury" where the victim sustained a broken right arm, burns to his leg, "knots all around his head," and his eyes were swollen shut), perm. to appeal denied (Tenn. Jan. 16, 2001); State v. Christopher L. Parker, No. 01C01-9701-CR-00037, 1998 Tenn. Crim. App. LEXIS 177, at *7 (Tenn. Crim. App. Feb. 11, 1998) (finding sufficient evidence for "serious bodily injury" when the victim sustained various severe cuts and

bruises to his face and his nose was broken into several pieces requiring plastic surgery to correct the obvious disfigurement and the damage to his nasal cavities).

In the instant case, we conclude that the victim experienced a greater amount of pain than that "commonly associated" with his injury. The victim testified when the defendant struck his arm with the bat, the bone protruded through the skin,[1] and the pain was so great it caused him to defecate in his pants. He was given morphine in the hospital emergency room for the pain. Officer King testified that the defendant appeared to be in significant pain and that the towel which he had wrapped around his arm had quite a bit of blood on it. Dr. Crous testified that five days after the injury, the victim's arm was quite swollen and he prescribed analgesics. Additionally, the victim was unable to work for two months after the attack. Accordingly, we conclude that the evidence supports the jury's finding that the victim suffered serious bodily injury.

## II. Defendant's Prior Incarceration with a Juror

The defendant further contends that the trial court erred in denying his motion for a new trial, even though the defendant had once been incarcerated with one of the jurors, thus denying him an impartial jury.

The undisputed evidence revealed that the defendant had been incarcerated with juror, Ricky Robertson, for fourteen days in the Bedford County Jail about one and a half years before the trial of the instant case. During the voir dire, all jurors were questioned regarding their acquaintance with the defendant. Robertson did not respond to the question and testified later that he had not recognized the defendant at that time.

During the hearing on the motion for a new trial, Robertson was questioned about his having been incarcerated with the defendant:

> Q.    Now, why when you were asked the question – I believe this was the question by the Court: Regarding any knowledge of the defendant that could in any way cause you not to be fair and impartial to both the State and the accused William Jerry Neal, was the question during the voir dire. Was there a reason at that point, Mr. Robertson, that you didn't raise your hand and speak out and say, "Judge, I was in jail two weeks with [the] man just last year here in Bedford County?["]
>
> A.    The reason was I didn't recognize him.
>
> Q.    Didn't recognize him at all?

---

[1] Even the defendant testified that the impact of the bat was of such force to knock the victim to the ground.

A.    No, sir, I didn't.

Q.    Same man you spent two weeks with in jail. How many men would you estimate were in that jail cell?

A.    20 on weekends and 15 or 16 during the week. In and out, in and out.

Q.    He estimated 12. You are estimating a little higher?

A.    Yes, sir.

Q.    It does fluctuate from weekend and week day?

A.    Yes, sir.

Q.    The same man you had a brief argument with, you are saying you did not recognize him sitting at counsel table at the beginning of the trial?

A.    Yes, I am.

Q.    At any time during the trial, whether mid-morning, lunch time, mid-afternoon, late afternoon, at any point did you ever change your mind and realize I do recognize William Jerry Neal? I do recognize him as being the man I was in jail with a year and a half ago?

A.    No.

Q.    Not at all?

A.    No.

Q.    When he testified – I think Mr. Neal testified – listening to him and hearing his voice, did you not recognize the voice? Did that not prompt you to recognize him?

A.    No.

Q.    At what point thereafter did you finally learn that this was the same man you had spent two weeks with in jail?

A.    After I had a conversation with my sister about people deserving things. What went on in the courtroom. He had something to say about Bill was his uncle. I said I was in jail with Bill up there when I had that little time I had to go to jail. She said, "Then you should know him." I said, "I don't know him." I got to thinking well, it could have been one of those guys that come in there on the weekends or something. I didn't really know him until now.

Q.    You are saying you weren't certain and after your sister talked with you at that point you began to realize it might have been him.

A.    I had never met him before.

Q.    When you are talked [sic] about "Bill," are you talking about William Jerry Neal or his uncle?

A.    Bill, Bill Freeman.

Q.    At what point did you finally realize the man you had sat basically in judgment of in the jury trial was the same man you spent two weeks with in jail?

A.    It was probably a little while. I don't know. Maybe a day or so.

The defendant asserts that Robertson would not have been seated as a juror if he had answered truthfully. However, the defendant also testified that, during voir dire, he thought he recognized Robertson and so advised his trial counsel although he was not certain of Robertson's identity. The defendant confirmed with his uncle during the trial lunch recess that the juror in question was the same Ricky Robertson with whom he had been incarcerated.

"If a juror intentionally fails to disclose information on voir dire which might indicate partiality, a presumption of prejudice arises." State v. Rayfield Brice, No. W2000-02601-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 973, at *9 (Tenn. Crim. App. Dec. 18, 2001) (citing State v. Durham, 188 S.W.2d 555, 559 (Tenn. 1945)), perm. to appeal denied (Tenn. June 3, 2002). However, the defendant has the burden to show that the juror actually "is in some way biased or prejudiced." State v. Bigbee, 885 S.W.2d 797, 805 (Tenn. 1994).

The common law rules governing challenges to juror qualifications fall in two categories: propter defectum or propter affectum. State v. Janice Hansbrough-Eason, No. 02C01-9504-CR-00098, 1996 Tenn. Crim. App. LEXIS 787, at *9 (Tenn. Crim. App. Dec. 18, 1996), perm. to appeal denied (Tenn. Sept. 15, 1997). An objection based upon general disqualifications, such as alienage, family relationship, or statutory mandate, falls within the propter defectum, or "on account of defect," class, and, as such, must be made before the return of a jury verdict. Id. at **9-10. Propter

affectum, meaning "on account of prejudice," is based upon the existence of bias, prejudice, or partiality towards one party in the litigation "'actually shown to exist or presumed to exist from circumstances'" and may be challenged after the return of the jury verdict. Id. at *10 (quoting Durham, 188 S.W.2d at 559). This court has described "'bias in a juror [as] a leaning of the mind; propensity or prepossession towards an object or view, not leaving the mind indifferent; [a] bent; [for] inclination.'" Id. at *14 (quoting State v. Adkins, 867 S.W.2d 350, 354 (Tenn. Crim. App. 1993)). The trial court must carefully guard the jury selection process to ensure that no defendant is denied this right to a fair trial and that his right to a verdict from an impartial jury is not violated. Id. at *13.

In the present case, the juror failed to respond straightforwardly to questions asked on voir dire regarding his acquaintance with the defendant, although testifying later that he did not recognize the defendant until after the trial. Had the defense known of the relationship, counsel would have been entitled to further inquiry to ensure impartiality. However, defense counsel was made aware of a potential problem with this juror during the trial and took no action. Accordingly, we conclude that this complaint is waived. See Tenn. R. App. P. 36(a).

### CONCLUSION

Based upon the foregoing reasoning and authorities, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE